QUINCE, Judge.
Pep Boys challenges the trial court’s entry of a final summary judgment in the defamation suit they filed against Channel 13 and others affiliated with the station. We reverse the summary judgment because there are genuine issues of material fact concerning whether Channel 13’s broadcast was defamatory.
In the summer of 1994, Channel 13 and Phil Celli, a member of the station’s news team, decided to do an investigative report on local air conditioning repair shops. To help in the investigation, Celli solicited the aid of an auto repair expert whose name was received from the State of Florida and another expert who was supplied by Erie Seidel, the station’s consumer reporter. Celli selected a 1983 Ford Ltd to be the subject of the investigation and had it inspected by Kevin Leadbeater and Jim Tune, the experts. Both Leadbeater and Tune are air conditioning technicians who work for companies that directly compete with Pep Boys. Both technicians inspected the air conditioning unit and determined it was in good working condition. Celli and Leadbeater replaced a working AC fuse with a bad fuse so that the air conditioning system would blow hot air. Leadbeater also marked certain components of the air conditioning system so they could be identified as the original parts. Leadbeater acknowledged he did not mark the evaporator, and he did not take the unit apart to mark any internal parts.
Appellee Deborah Read, a Channel 13 employee, was instructed to take the vehicle to local air conditioning shops, picked at random by Celli, to determine why the air conditioning unit was blowing hot air. In order to videotape individuals testing, inspecting, and repairing the air conditioning unit, the vehicle was equipped with a small video camera located under the hood. The videotape ran for twenty minutes and the same cassette was used over and over again, the result being that each use erased the record of the prior visit. Therefore, there was no film record of any of the visits or repairs done at any of the shops.
After visits to at least eight other shops where repairs, ranging from replacing the fuse to replacing the accumulator hose and the AC clutch, were done, the vehicle was taken to the Pep Boys shop located on south Dale Mabry Highway. Pep Boys offered a diagnostic quick check for air conditioning units for $21.99; this payment would be applied to the price of any repairs done as a result of this diagnostic check. During Pep Boys’ cheek the bad fuse was discovered and *1327 replaced. In addition, Pep Boys discovered a leak in the evaporator unit and recommended replacement of the evaporator, the evaporator switch, the accumulator, and the ti-tube, at a cost of $578.08.
Read reported Pep Boys’ findings to Lead-beater who reehecked the system with a leak detector which had never been calibrated and opined that the system did not leak. Nonetheless, Read, upon Celli’s instruction, returned the car to Pep Boys and authorized the recommended repair work. After completion of the work, the removed parts were given to Read. Leadbeater confirmed that the parts were the original ones, but he was unable to confirm that the evaporator was the original one because it had not been marked. Leadbeater did not test the removed evaporator for leaks, but his inspection of the heater core revealed traces of a water leak.
Celli and Seidel, armed with a rolling television camera, went to Pep Boys to question personnel concerning the validity of the repair work. Pep Boys, by letter dated November 2, 1994, explained its position on the repairs and questioned the testing and control procedures employed by Channel 13. The letter stated an internal investigation had been conducted and Pep Boys concluded the repair work was necessary to restore the air conditioning system to optimum working condition.
The letter was forwarded to the station’s expert, Leadbeater, who showed the letter to Richard Bier, shop foreman at Wilsey Auto Service. Bier offered to bench test the evaporator core that was removed from the vehicle. Bier’s shop had a more sensitive and accurate leak detector than the one used by Leadbeater. Bier’s offer was conveyed to Celli, and on November 10, 1994, Celli left the parts at Wilsey’s for testing. Wilson, the mechanic at Wilsey’s shop and an ASE certified master mechanic, personally tested the removed evaporator using a Yokogawa H-10G, a self-calibrating leak detector recognized as the best unit available. The testing confirmed Pep Boys’ diagnosis of a leak in the evaporator. Wilson observed a dust and oil residue pattern on the evaporator which indicated the leak had existed for some time while the evaporator was in the car. Wilson’s testing was supervised by Bier, who agreed that there was a leak in the evaporator. This information was communicated to Celli on November 11, 1994. Bier offered to demonstrate the testing and explain the findings to Celli.
Celli never took Bier up on his offer and proceeded to broadcast the report concerning the air conditioning repairs on November 16, 1994, during the 6:00 p.m. newscast. The broadcast began with co-anchor John Wilson stating the program went undercover to expose mechanics involved in ear repair nightmares. Seidel began his report by asking which mechanics can you trust not to burn you. The broadcast explained replacing a working fuse with a bad fuse to test local repair shops. The reporter explained that the vehicle was taken to a number of shops with varying results. When the broadcast got to Pep Boys, the reporter indicated Pep Boys replaced the fuse for $21.00; nothing was said about the diagnostic check and the fee for such a check. The reporter then said that after replacing the fuse, Pep Boys gave Ms. Read a list of other needed repairs totaling $578.08. He then asked the question, “What did our expert think?” The broadcast switched to Leadbeater saying, “The evaporator is fine. There is no leak in the evaporator case at all. The system is perfectly fine. It’s working 100%.” The broadcast then switched to Seidel asking Pep Boys to explain all the repairs for just a blown fuse. Nothing was said in the broadcast about the testing by Wilsey Auto Service.
On the day after the broadcast, Celli went to Wilsey’s to retrieve the parts and participated in a heated discussion concerning the inaccuracy of the broadcast. Despite Wil-sey’s insistence that the evaporator did leak, Celli simply retrieved the parts and tossed them in a dumpster. Thereafter, on December 5,1994, Caroline Spenser, Wilsey’s president, wrote a letter to Pep Boys confirming the leak in the evaporator and informing them that Channel 13 was aware of this information prior to the broadcast.
On December 20, 1994, Pep Boys demanded a retraction from Channel 13. When the station refused, Pep Boys filed suit for defa *1328 mation and conspiracy to defame on December 15, 1995. The trial court granted the station’s motion for summary judgment, and this appeal timely followed.
The trial court erred in granting summary judgment and finding that “there are no false statements of fact to be, found in the Channel 13 broadcast of ‘Car Repair Nightmare’ that may reasonably be interpreted as defamatory.” On a motion for summary judgment, the trial court must accept as true every factual allegation and every reasonable inference which can be drawn therefrom which is favorable to the nonmov-ing party. See Hervey v. Alfonso, 650 So.2d 644 (Fla. 2d DCA 1995). If there is any genuine issue of material fact or the possibility of any issue, or if the record raises even the slightest doubt that an issue may exist, that doubt should be resolved in favor of the nonmoving party. The record in this ease reflects issues of fact concerning the falsity of the statements about the price for replacing the fuse, the necessity of replacing the evaporator and other parts, as well as whether there was in fact a leak in the evaporator. The questions of whether the broadcast contained false statements and/or statements that could be interpreted as false are questions of fact which should be left for a jury to determine where the communication is ambiguous and is reasonably susceptible of a defamatory meaning. See Perry v. Cosgrove, 464 So.2d 664 (Fla. 2d DCA 1985); Wolfson v. Kirk, 273 So.2d 774 (Fla. 4th DCA 1973).
Because there are genuine issues of material fact which are in dispute and the broadcast is ambiguous and reasonably susceptible of a defamatory meaning, the trial court erred in granting summary judgment. We, therefore, reverse the grant of summary judgment and remand for further proceedings.
FRANK, A.C.J., and PATTERSON, J., concur.